UNITES STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZL TECHNOLOGIES, INC, <br><br> Plaintiffs, <br><br> - against - <br><br> KLDISCOVERY ONTRACK, LLC; SHIELD FINANCIAL COMPLIANCE, LTD.; SHIELD FINANCIAL COMPLIANCE, INC. and AARON GARDNER, <br><br> Defendants. | Case No. 1:25-cv-02673-JPO <br><br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANT SHIELD FINANCIAL COMPLIANCE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT WITH PREJUDICE PURSUANT TO PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

**ZEICHNER ELLMAN & KRAUSE LLP**
730 Third Avenue
New York, New York 10017
Telephone: (212) 223-0400

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ii

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF ALLEGATIONS, MISSING ALLEGATIONS, AND FACTS ......... 4

ZL'S ALLEGATIONS AND RELATED FACTS .......................................................... 5

THE RELEVANT TERMS OF THE SDLSA ................................................................ 8

THE RELEVANT TERMS OF THE PLA ................................................................... 10

ARGUMENT .............................................................................................................. 12

I.    THE COURT SHOULD DISMISS COUNTS ONE (FALSE
      DESIGNATION OF ORIGIN IN VIOLATION OF THE LANHAM ACT)
      AND THREE (UNFAIR COMPETITION BY CREATING CONFUSION
      OF MISTAKE UNDER NEW YORK LAW) WITH PREJUDICE ................. 13

      A.    ZL's Lanham Act Claim Fails to State a Legal Claim............................. 13

      B.    ZL's New York Claim for Unfair Competition Through Confusion or
            Mistake Fails to State a Legal Claim ...................................................... 15

II.   THE COURT SHOULD DISMISS COUNT TWO OF THE FAC (UNFAIR
      COMPETITION BY MISAPPROPRIATION) WITH PREJUDICE ............... 19

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*AJV Computer Assocs. Int'l Inc. v. Computerized Data Mgmt., Inc.*,
 889 F. Supp. 630 (E.D.N.Y. 1995) ...............................................................16

*Antidote Int'l Films, Inc. v. Bloomsbury Pub'g, PLC*,
 467 F. Supp. 2d 394 (S.D.N.Y. 2006) .........................................................14

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .....................................................................................12

*Bell Atl. Corp. v. Twombly*
 550 U.S. 544 (2007) ...........................................................................12, 18, 20

*Bubble Genius LLC v. Smith*,
 239 F. Supp. 3d 586 (E.D.N.Y. 2017) .........................................................18

*Carson Optical Inc. v. eBay Inc.*,
 202 F. Supp. 3d 247 (E.D.N.Y. 2016) .........................................................18

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
 348 F. Supp. 2d 217 (S.D.N.Y. 2004) .........................................................17

*CDC Newburgh Inc. v. STM Bags, LLC*,
 692 F. Supp. 3d 205 (S.D.N.Y. 2023) .............................................15, 18, 19

*Converged Compliance Sols., Inc. v. XOP Networks, Inc.*,
 2024 U.S. Dist. LEXIS 173883 (S.D.N.Y. Sep. 25, 2024) .........................15

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
 539 U.S. 23 (2003) .............................................................................13, 14, 15

*digiGAN v. iValidate, Inc.*,
 2004 U.S. Dist. LEXIS 1324 (S.D.N.Y. Feb. 3, 2004) ..............................14

*Doherty v. American Home Products Corp.*,
 1999 U.S. Dist. LEXIS 16101 (D. Conn. Oct. 15, 1999) ...........................12

*Empower Fed. Credit Union v. Empower Annuity Ins. Co. of Am.*,
 2024 U.S. Dist. LEXIS 137791 (N.D.N.Y. Aug. 2, 2024) .........................15

*Fleming Sales Co. v. Bailey*,
 611 F. Supp. 507 (N.D. Ill. 1985) ...............................................................19

*Greene v. Warner Music Grp.*,
 2024 U.S. Dist. LEXIS 107515 (S.D.N.Y. June 18, 2024) ..................14, 15

*Honig v. Hansen*,
 2021 U.S. Dist. LEXIS 195130 (S.D.N.Y. Oct. 8, 2021) ...........................12

*I Candy by JW LLC v. Spin Master Ltd.*,
  2018 U.S. Dist. LEXIS 251854 (E.D.N.Y. June 19, 2018) ......................................14

*Invista S.a.r.l. v. E.I. Du Pont de Nemours & Co.*,
  2008 U.S. Dist. LEXIS 94009 (S.D.N.Y. Oct. 30, 2008) ......................................14

*Lapine v. Seinfeld*,
  2009 U.S. Dist. LEXIS 82304 (S.D.N.Y. Sept. 10, 2009) ......................................14

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  561 F. Supp. 2d 368 (S.D.N.Y. 2008) ......................................17

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
  209 F. Supp. 3d 612 (S.D.N.Y. 2016) ......................................16

*McCarter & Eng., LLP v. Jarrow Formulas, Inc.*,
  715 F. Supp. 3d 281 (D. Conn. 2024) ......................................19

*MidCap Bus. Credit, LLC v. MidCap Fin. Tr.*,
  655 F. Supp. 3d 193 (S.D.N.Y. 2023) ......................................16

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) ......................................16, 17

*Rapoport v. Asia Elecs. Holding Co., Inc.*,
  88 F. Supp.2d 179 (S.D.N.Y. 2000) ......................................12

*RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*,
  527 F. Supp. 3d 305 (E.D.N.Y. 2021) ......................................16

*Saratoga Vichy Spring Co. v. Lehman*,
  625 F.2d 1037 (2d Cir. 1980) ......................................19

*SS&C Techs. Holdings, Inc. v. Arcesium LLC*,
  2024 U.S. Dist. LEXIS 230686, at *34 (S.D.N.Y. Dec. 20, 2024) ......................................18, 19

*Webb v. Kenney*,
  234 F. Supp.2d 197 (E.D.N.Y. 2002) ......................................12

**Rules**

Fed. R. Civ. P. 12(b) ......................................1

Fed. R. Civ. P. 12(b)(2) ......................................5

Fed. R. Civ. P. 12(b)(6) ......................................5, 12

**Statutes**

15 U.S.C. § 1125 ...................................... 6, 13-14

28 U.S.C. § 1367(c) ......................................15

Defendant Shield Financial Compliance, Inc. ("Shield Delaware") respectfully submits this Memorandum of Law in support of its motion to dismiss plaintiff ZL Technologies, Inc.'s ("ZL" or "ZLTI") First Amended Complaint ("FAC") with prejudice. *See* Fed. R. Civ. P. 12(b).[1]

## PRELIMINARY STATEMENT

This is ZL's second failed attempt to bring a viable legal claim against Shield Delaware and Shield Financial Compliance Ltd. ("Shield Israel") (jointly, "Shield" or the "Shield Defendants"). The circumstances, as now made clear by ZL, fail to give rise to viable legal claims against the Shield Defendants. As no amount of further tinkering by ZL will change this outcome, the Court should dismiss the Shield Defendants from this action with prejudice.

On April 30, 2008, plaintiff ZL entered a maximum 10 year (five years, with five one-year extensions) "Private Label License Agreement" ("PLA") with Renew Data Corp., an alleged predecessor to defendant KLDiscovery Ontrack LLC ("KLD" or "Renew Data" or "Renew Data/KLD") *See* FAC, Ex. 2 [ECF No. 46-2]. Under the PLA, ZL was just a subcontractor to Renew Data. Two years earlier, Renew Data had entered its own contract with Renew Data's "Client" to provide certain software services. *See* Software Development, License, and Services Agreement between "Client" and Renew Data/KLD ("SDLSA") at FAC, Ex. 1 [ECF No. 46-1].[2] The SDLSA recognized that KLD might bring subcontractors in to support KLD's efforts, but by

---

[1] Shield Financial Compliance, Ltd. ("Shield Israel") is separately filing a motion to dismiss the complaint as to it on jurisdictional and territorial grounds but, to the extent applicable, also adopts and joins the arguments made by Shield Delaware in this motion to dismiss. Further, both Shield Delaware and Shield Israel adopt and join, to the extent applicable, the arguments raised in the motions to dismiss of co-defendants KLD and Aaron Gardner.

[2] ZL has redacted the SDLSA attached as Exhibit 1 to its Amended Complaint to obscure the fact that it does not have privity of contract to assert its terms. The contract is between Renew Data Corp. and "Client," not Renew Data Corp. and ZL, as ZL falsely alleges in the Amended Complaint. *See, e.g.*, Am. Compl. ¶ 11. However, ZL's redactions of the Client's name are incomplete, allowing the Court to see ZL is not a party to the SDLSA. *See, e.g.*, SDLSA at page 9 (Section 3 Title) and page 25 (at Section 122(b)).

no means did the SDSLA elevate any such subcontractor to "partner" status. Nor in any way did it mature its subcontractor into KLD's "Client" relationship. In fact, the SDSLA specifically provided for KLD and the Client replacing subcontractors over its course and thereafter. SDSLA §§ 8 and 9.3(b). At no point was ZL, nor any other subcontractor, a signatory to the SDSLA, and ZL cannot properly claim any privity of contract, whatsoever, with the Client under its provisions.

The PLA (which ZL did sign) expired by its own terms no later than April 30, 2018. PLA, § 2. However, as part of the PLA, ZL expressly granted Renew Data a "**perpetual**, world-wide **irrevocable** license" (emphases added) to use the technology in providing services to KLD's Client, a perpetual right which continues past expiration of the PLA and the end of ZL's role as a KLD subcontractor. PLA, § 9.3-9.6. In fact, the PLA gave RenewData/KLD the right to work with a third party to "make such modifications and adaptations as are necessary to use the Software."[3] *Id.* § 4.6.3. The PLA also "permits contactors of RenewData" to access and use the Software, without even the requirement of signing any obligations of Confidentiality. *Id.* § 1. Given these express contractual provisions, ZL bald claim that it protects its Software, or that it was somehow purloined by Defendants, is both untrue and unsuccessful. The PLA contains no provision restricting Renew Data or its contractors from sharing access to the Software with third parties, nor does it impose any confidentiality obligations on such third parties. If ZL had intended to limit the use or disclosure of its technology, it could have negotiated for such restrictions. Its failure to do so is fatal to its claims here.

Seven years after the PLA terminated, and after reaping millions of dollars from the benefit of its bargain, ZL is no longer happy with the deal it first struck with KLD two decades ago. Nor

---

[3] "Software" means "the Standard Software and the Developed Software and any other software programs provided to RenewData by ZLTI under this Aagreement." PLA, Schedule F (definitions).

is ZL happy to see Shield Israel now working with Client, instead of ZL. Voicing sour grapes, it has sued Shield.[4] Each of ZL's three purported causes of action against Shield fail as a matter of law.

Shield vehemently denies that it used ZL technology in the development of its own software. But even if, *arguendo*, it had, Count Two of the FAC (Unfair Competition under New York Law – Misappropriation) fails as a matter of law because, among other things, the PLA (i) granted KLD a perpetual irrevocable license over all ZL intellectual property, including the right to use ZL's technology with third parties following termination, and (ii) contractually terminated all trade secret protection to ZL technology. *See* Argument, Point II.

ZL's two other claims fare no better. Count One (federal Lanham Act – False Designation of Origin) and Count Three (Unfair Competition under New York Law – Confusion or Mistake) attempt to cobble together claims around the purported trademark "Unified Archive." However, ZL admits in the FAC that it chose to abandon that mark and ceased using that term in its advertising around 2018-2019, in favor of "ZL UA." Moreover, ZL does not even allege facts in the FAC showing that Shield ever has used "Unified Archive" or "ZL UA" in connection with its Shield products – alleging only that KLD used that term on KLD's Website over seven years ago. Shield is not KLD, of course, and entirely missing from the Amended Complaint is any allegation that Shield controls the KLD website and its content, or KLD's advertising efforts generally. Equally absent is any factual allegation showing that Client or any other unidentified potential client of ZL or Shield – whose products are designed for large and sophisticated financial

---

[4] Part of ZL's motivation for filing this meritless action was to manufacture an excuse to send a June 20, 2025 email full of falsehoods and defamatory statements to "top management" at Client. *See* July 8, 2025 Shield Delaware Motion for Injunctive Relief, available at ECF Doc. Nos. 42, 43, 44, 45, and 55. Hopefully, ZL's attempt to misuse the Court system to tortiously interfere with Shield's contractual and investor relationships with Client will not succeed.

institutions facing regulatory risk – ever confused a Shield product for a ZL product. Beyond the failure to allege sufficient facts, United States Supreme Court precedent makes plain that the Lanham Act does not protect "false origin" claims like ZL's that concern the inner workings of a product. *See* Argument, Point I.

Moreover, the Amended Complaint contains no factual allegations that Shield Delaware exercised any control over KLD's marketing, website, or business decisions. The mere fact that KLD may have referenced "Unified Archive" or ZL's technology on its own website or in its own materials cannot, as a matter of law, be imputed to Shield Delaware. There is no allegation of any agency, partnership, or principal-agent relationship between Shield Delaware and KLD that could justify such attribution. Accordingly, any alleged acts or omissions by KLD cannot serve as a basis for liability against Shield Delaware.

This case is, at best, a contract dispute between ZL and KLD about monies allegedly owed under the PLA. *See* FAC, Count Four (Breach of Contract as to KLD). It has nothing to do with the Shield Defendants. For these and other independent reasons, ZL's claims against the Shield Defendants should be dismissed with prejudice.

## STATEMENT OF ALLEGATIONS, MISSING ALLEGATIONS, AND FACTS

ZL brings three causes of action against the Shield defendants: False Designation of Origin in violation of the Lanham Act (Count One); Unfair Competition by Misappropriation under New York law (Count Two); and Unfair Competition by Creating Confusion of Mistake under New York law (Count Three). Count Four (Breach of Contract) is brought only against KLD. *See* FAC [ECF Dkt. No. 46] ¶¶ 63-101.

**ZL's Allegations and Related Facts[5]**

ZL alleges it is "in the business of providing 'big data' software services to its clients so that each client can meet standard judicial, regulatory and compliance requirements." FAC ¶ 14. As part of its business, ZL avers it has had a long-standing contractual relationship with defendant KLD and, pursuant to that relationship, disclosed to KLD its proprietary and secret unified architecture technology, incorporated in ZL's "UA (Unified Archive)" product, "now in version 9.1." *Id.* ¶¶ 1, 11, 15, 19, 27-32. ZL identifies two purported contracts "executed between Plaintiff [ZL] and Renew Data" – the SDLSA and SDLSA Amendments, attached to the FAC as Exhibit 1, and the PLA, attached to the FAC as Exhibit 2. *Id.* ¶¶ 11-12.

In fact, the SDLSA is between Client and Renew Data – ZL is not a party to the SDLSA – and the SDLSA Amendments are not attached to the FAC. *See id.*, Ex. 1 (SDLSA).[6] The PLA is between Renew Data and ZL. *See id.*, Ex. 2 (PLA).

ZL alleges that "[o]ver the years, ZL and KLD formed a close partnership in the provision of software services to one particular client, a multinational financial institution referred to hereinafter as the 'Client.'" *Id.* ¶ 1. Client is now a Shield Israel client and "a major institutional investor into Shield Israel." *See* FAC ¶¶ 56, 59-60.

---

[5] While the factual allegations of the FAC are to be taken as true on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), many of those pled facts are incorrect. Some, but not all, of those incorrect "facts," are corrected in the Declaration of Gadi Divald, the Chief Financial Officer of Shield Israel ("Divald Decl."), and the Declaration of Shiran Weitzman, the Director of Shield Delaware ("Weitzman Decl."), that accompany the Motion of Shield Israel to Dismiss the FAC under Rule 12(b)(2) for lack of personal jurisdiction over it.

[6] When Shield counsel noticed the SDLSA Amendments were missing from the FAC, we asked for them. ZL counsel informed the Amendments had not been intended to be part of FAC, Ex. 1, and Shield would eventually obtain them in discovery.

ZL alleges that, in 2012, defendant Gardner began working for KLD as its "Vice-President Legal Technology Consulting" and, in 2015, was "appointed Vice-President, Compliance, Information Governance and Archiving." FAC ¶¶ 34, 37. In those KLD roles, Gardner allegedly "became privy to ZL's proprietary information, including ZL UA" and "became a point of contact" for Client at KLD. *Id.* ¶ 36. Even so, nowhere in the FAC does ZL specifically claim that Gardner had access to the Software while at KLD, or that ZL sought a confidentiality agreement or other protections from Gardner.

ZL alleges that, between 2018 and 2020, after the PLA terminated, KLD arranged "multiple demonstrations" in which "ZL's big data capabilities were presented to Shield." *Id.* ¶ 45. ZL also alleges that, "in January 2022," Shield Israel hired Gardner "as a Compliance Strategist" to "gain access to ZL's solutions and architecture." *Id*. ¶¶ 50-51. ZL alleges that, through Gardner, "Defendants incorporated ZL's intellectual property and specific aspects and data of the ZL UA architecture, including ZL's confidential and proprietary information into Defendants' Nebula platform, and elsewhere." FAC ¶ 76. Thereafter, "Shield Israel and Shield Delaware [began to] palm off ZL's technology solutions as its/their own." *Id.* ¶ 1. ZL alleges that "[t]he Client, following the misappropriation, has begun migrating data from the ZL-KLD partnership, and presumably intends to seek software development and services from KLD and Shield instead." *Id.* ¶ 1.

ZL alleges that Shield has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by incorporating ZL's architecture into Shield products and "passing off" this architecture as its own. FAC ¶ 66. Specifically, by "using information purloined from ZL to create Shield's alleged 'flexible, scalable data solution,' Defendants created a false designation of origin and a misleading representation of fact as to the origin and sponsorship." *Id.*

ZL alleges it once had a registered trademark in the "Unified Archive," U.S. Trademark Reg. 3,833,864, but states it was cancelled on or about August 17, 2020. FAC ¶ 23.[7] ZL also alleges that it has a common-law unregistered trademark in the term "ZL UA [that] has been used exclusively and continuously by ZL in interstate commerce to identify and distinguish ZL's unified architecture solution for decades" and has "achieved secondary meaning as an identifier of ZL's architecture solutions and services. FAC ¶¶ 20, 23. ZL pleads no facts supporting its claim that its purported marks have secondary meaning. On the contrary, the only ZL-signed contract identified by ZL, the PLA, had ZL agreeing to a "private label" arrangement where it agreed not to use its trademarks and branding, and further agreed to mask and obscure the "origin" of its products from all end-users, including Client. *See* PLA [ECF Doc. No. 46-2], Schedule D.

Although this is a Lanham Act case, ZL does not identify a single specific Shield advertisement, identify any false statements in those advertisements, or even assert that this supposed Shield advertising contains the terms "Unified Archive" or "ZL UA," which appear to be the terms ZL contends are. or were, entitled to trademark protection under the Lanham Act. *See generally*, FAC ¶¶ 14-62 (Common Facts).

ZL's failure to plead facts showing that the Shield Defendants' advertising contained the terms "Unified Archive" or "ZL UA," is not an oversight by ZL. ZL went to a great deal of effort to find pages from the KLD Website that assertedly contain improper and infringing references to "Unified Archive" or "ZL UA." *See* FAC ¶¶ 40-44 and Ex. 3 (KLD Website pages from

---

[7] It is unclear if ZL is still claiming trademark protection for the now cancelled "Unified Archive" mark. If it is, its claim is misplaced. Publicly available websites show that ZL allowed the term "Unified Archive" to become a commonly used generic term. *See, e.g.*, https://docs.oracle.com/cd/E37838_01/html/E60984/gmwcb.html (Oracle's using "Unified Archive"); https://github.com/wapmorgan/UnifiedArchive (GitHub defining "Unified Archive" as "an archive manager with unified interface for different formats that works on wide variety of system configuration").

August 18, 2018) and Ex. 4 (KLD Website pages from November 14, 2019). By contrast, the FAC does not allege that those terms were ever stated or used on the Shield website, and ZL provides no Shield Website pages with those terms on them. *Id.* Equally absent is any allegation that Shield controls the KLD website and its content, or KLD's advertising efforts generally.

While ZL alleges Defendants' "false designation of origin" is "likely to cause confusion, mistake, or deception as to the source, origin, affiliation, association or sponsorship of Shield Israel and Shield Delaware's services and to falsely mislead consumers into believing that Shield and its services originate from, are affiliated or connected with, or approved by, ZL" (FAC ¶¶ 64, 84), no lost sales or customers are identified by ZL in its FAC other than the Europe-based Client. *See id.* ¶¶ 14-62 (Common Facts). While ZL parrots that "Defendants' conduct has resulted in actual confusion as to these services in at least two instances" (*id.* ¶ 65), no facts as to those "two instances" are provided by ZL in its FAC, or any other facts of actual confusion.

Rather, the few facts alleged in the FAC show a lack of confusion. In this regard, ZL expressly alleges Shield successfully responded to Requests for Proposal ("RFP") issued by Client. FAC ¶¶ 60-61. Any contention that Client confused who was responding to an RFP, or somehow believed Shield Israel was offering Client ZL products, rather than its own Shield products, would be implausible.

**<u>The Relevant Terms of the SDLSA</u>**

Contrary to ZL's express assertion (FAC ¶ 11), ZL is not a party to the March 7, 2006 SDLSA.[8] The SDLSA is between Renew Data/KLD, defined as the "Supplier," and Client. *See*

---

[8] ZL alleges that "Amendments were entered to the SDLSA on July 1, 2015, December 13, 2018, and January 9, 2018," and "signed by Defendant Aaron Gardner on behalf of Defendant KLDiscovery." FCA ¶ 11. Despite ZL stating those Amendments are attached as part of Ex. 1 to the FCA, none were attached to the FCA.

SDLSA [ECF Doc. No. 46-1]. Because it is not a party to the SDLSA, ZL does *not* have the rights it asserts here and is improperly bolstering its allegations off the bootstraps of others.

The SDLSA is clear. It "sets forth the terms and conditions wherein the Supplier [Renew Data] will provide Software and the Services (including, without limitation, certain software development services as detailed herein) to [Client]." SDLSA at pg. 4. The software to be provided by Renew Data under the SDLSA is referred to as the "Standard Software." *Id.* at pg. 6. Renew Data was permitted to supply elements of the Standard Software to Client through Sub-Contractors, including ZL, then known as ZipLip Inc. *Id.* at pg. 6 (definition of Sub-contractor) and § 9.3(a) (Sub-Contracts). The SDLSA provided:

> "**Standard Software**" means the standard software programs, including all Upgrades thereto, third party components or products (including embedded software), to be provided by the Supplier as set out in the Standard Software Licence Schedule (including, but not limited to, ZIPLIP software)

*Id.* at pg. 6.

As part of SDLSA, Client received a perpetual, irrevocable (except in the case of breach by [Client]) royalty free, non-exclusive, worldwide license" in both Pre-existing Intellectual Property and in the Standard Software and its related Documentation:

> The Supplier grants [Client] and the [Client] Affiliates a perpetual, irrevocable, (except in the case of breach by [Client]), royalty free, non-exclusive, worldwide licence to use copy, modify, adapt and to permit contractors of [Client] and [Client] Affiliates to use, the Supplier's Pre-existing Intellectual Property (other than the Standard Software and its related Documentation. which shall be licensed to [Client] pursuant to Clause 4.2), for [Client]' general business purposes in accordance with this Agreement.
>
> In the case of any Pre-existing Intellectual Property licensed from a third party, the licensing party warrants that it will have obtained any necessary authority, permission or licence from the relevant third party in order to grant the above licenses.

SDLSA § 4.1(b), (c). *See also id.* § 4.2(a) (granting Client "a perpetual, world-wide, royalty free, irrevocable, (except in the case of breach by [Client]), non-exclusive licence to use the Standard

Software and its related Documentation."). Client received licenses to ZL's entire "Unified Platform System" and all Upgrades to it. *See id.* at pgs. 26, 28, 31. In addition, Client automatically owns all Developed Software and Work Products. *Id.* §§ 4.3-4.4.[9]

The SDLSA expressly contemplates the possibility of a third party like ZL terminating its agreement with KLD. SDLSA § 8.4. In that event, "Supplier [KLD] will either provide an alternative product or negotiate a license on behalf of any such third party product … which may be reasonably necessary to carry out the provisions of this Agreement." *Id.*

ZL alleges that, "[o]n March 26, 2025, ZL terminated the SDLSA," FAC ¶ 98. This claim is legally baseless as ZL is not a party to the SDLSA and thus lacks any authority or standing to terminate it. This empty claim does, however, highlight ZL's serial attempts throughout the FAC to improperly inflate its role beyond that of a KLD private label subcontractor.

**The Relevant Terms of the PLA**

On April 30, 2008, ZL and Renew Data entered the PLA. It terminated no later than April 30, 2018, by its own terms. *See* PLA [ECF Doc. No. 46-2] § 2 (Term).

ZL granted Renew Data/KLD the following broad licenses:

a non-exclusive, worldwide license to use, adapt and to permit contractors of RenewData to use the Software and its related Documentation solely to provide Hosted Services[10] in accordance with this Agreement.

PLA, § 1.

---

[9] "**Developed Software**" means "the software programs to be developed by the Supplier as described in the Development Services Schedule, including, without limitation, all third party components or products (including embedded software) and all Upgrades thereto (if applicable)." SDLSA at pg. 5.

[10] "**Hosted Services**" means "to load, store, and perform archiving-related functions using the Software on Archived Data on RenewData servers or RenewData-managed third-party servers, and to provide to RenewData Clients the online availability and use of the Software to access Archived Data." PLA, Schedule F.

a perpetual, world-wide, irrevocable, (except in the case of breach by RenewData), non-exclusive license to use the Intellectual Property Rights in or relating to the Work Products in accordance with this Agreement.

*Id.* § 4.3

The PLA also authorized Renew Data to use any future ZL "enhancements" or "Upgrades":

If during the term of the Agreement, ZLTI develops any successor products (offering similar functionality to the Software or any module of the Software) or enhancements to the Software which are made generally available to other customers of ZLTI for no additional fee, RenewData shall be authorized to use such New Product pursuant to the terms and conditions of this Agreement in respect of such New Product provided that RenewData is current on its Support payments.

*Id.* § 4.3. *See also id.*, Schedule A, § 4.2 (Upgrades) at 4.2.5 ("Upon successful implementation of the Upgrade, the Upgrade shall form part of the Software for the purposes of this Agreement and the licensing provisions applicable to the Software under this Agreement shall apply in full to such Upgrade.").

Among the licensed ZL products in the "Private Label Renew Data Archive" was the "ZL Unified Archive Platform." PLA, Schedule B (Software). Notably, this was a "Private Label Agreement," meaning ZL agreed to make the "origin" of the Unified Archive Platform entirely unknown to the end user. Indeed, all the end user was supposed to see was Renew Data's logo and branding. Thus, ZL agreed to the following:

- o "RenewData will be able to use its own trademarks to market the Software."

- o "ZLTI shall provide all client views of access to the archive as 'RenewData' and the ActiveVault branding as defined by RenewData. There will be no mention of ZLTI."

- o "All references to ZLTI and ZipLip shall be removed from any screen or interface which may be viewable to an end user."

- o "RenewData will provide corporate logos and branding such that the private label archive will carry the RenewData trademark branding ActiveVault$^{TM}$."

PLA, Schedule D (Private Label Requirements).

ZL expressly agreed that "Termination of this Agreement shall not affect RenewData's rights and ability to continue to provide Hosted Services to RenewData Clients." PLA, §9.3. Thus, ZL is required to continue to provide Support Services for existing RenewData Clients for as long as those RenewData Clients remain RenewData Clients receiving the Hosted Services. *Id.* § 9.6.1.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S at 678. "A plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions.'" *Twombly*, 550 U.S. at 555. Pled facts are what is required to survive a motion to dismiss – a "formulaic recitation of the elements of a cause of action will not do." *Id.* Nor should the Court "accept as true a legal conclusion couched as a factual allegation." *Id.*

If, as here, documents appended or referenced in the complaint "contradict the allegations of the … complaint, the documents control and this Court need not accept as true the allegations in" the complaint. *Rapoport v. Asia Elecs. Holding Co., Inc.*, 88 F. Supp.2d 179, 184 (S.D.N.Y. 2000); *Honig v. Hansen*, 2021 U.S. Dist. LEXIS 195130, *18-19 (S.D.N.Y. Oct. 8, 2021) (same); *Webb v. Kenney*, 234 F. Supp.2d 197, 201-02 (E.D.N.Y. 2002) (dismissing due process claim where claim contradicted by agreement); *Doherty v. American Home Products Corp.*, 1999 U.S. Dist. LEXIS 16101, *15-16 (D. Conn. Oct. 15, 1999) (refusing to vacate prior dismissal of claims

because "plaintiffs' claims are directly contradicted by the very documents -- the stock option Agreements and Plans -- upon which they purport to rely").

The Court should dismiss the FAC *with prejudice*. In response to prior motions to dismiss, ZL amended its complaint to try to state a viable claim against the Shield Defendants. It has failed to do so. Indeed, ZL's effort to amend has underscored that the flaws in its claims are material, fatal, and irreparable. Thus, giving ZL another opportunity to amend would be futile and a further waste of both party and judicial resources. Instead, the Court should dismiss the FAC with prejudice.

I. **THE COURT SHOULD DISMISS COUNTS ONE (FALSE DESIGNATION OF ORIGIN IN VIOLATION OF THE LANHAM ACT) AND THREE (UNFAIR COMPETITION BY CREATING CONFUSION OF MISTAKE UNDER NEW YORK LAW) WITH PREJUDICE**

A. **ZL's Lanham Act Claim Fails to State a Legal Claim**

In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), the United States Supreme Court considered the scope of an action for false designation of origin under Section 43(a)(1)(A) of the Lanham Act. Id. at 27, 31. In *Dastar*, petitioner Dastar lightly edited the tapes of a 1949 television series about World War Two whose exclusive video distribution rights were owned by respondent Twentieth Century Fox. Dastar then re-packaged the edited series on video and sold it as its own product, with no reference to the original series. 539 U.S. at 26-27. Twentieth Century Fox sued Dastar under the Lanham Act for false designation of origin and lost. *Id.* at 38.

The Supreme Court found that the word "origin" in Section 43(a)(1)(A) of the Lanham Act means "the producer of the tangible goods that are offered for sale, and not . . . the author of any idea, concept, or communication embodied in those goods." *Id.* at 37.

> [A]s used in the Lanham Act, the phrase 'origin of goods' is…incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain. Such an extension would not only stretch the text, but it would be out of

accord with the history and purpose of the Lanham Act and inconsistent with precedent.

*Dastar*, 539 U.S. at 32. Because Dastar was the originator of the products it sold, the Supreme Court found that the Lanham Act claim failed. "[T]o hold otherwise would be akin to finding that §43(a) created a species of perpetual patent and copyright, which Congress may not do." *Id.* at 38.

The same result is called for here. Because ZL's allegations are merely that Shield used its claimed innovations, not that there is confusion as to the origin of Shield's product itself, ZL fails to state a cognizable Lanham Act claim as a matter of law. *See, e.g., Lapine v. Seinfeld*, 2009 U.S. Dist. LEXIS 82304, *45 (S.D.N.Y. Sept. 10, 2009) (Lapine's assertion that the "alleged misrepresentations" are "likely to cause confusion or deception as to the origin of [Seinfeld's product] and Lapine's property contained therein" is "precisely the type of claim that is precluded by *Dastar*"); *Antidote Int'l Films, Inc. v. Bloomsbury Pub'g, PLC*, 467 F. Supp. 2d 394, 400 (S.D.N.Y. 2006) (reasoning that "the holding in *Dastar* that the word 'origin' in § 43(a)(1)(A) refers to producers, rather than authors, necessarily implies that the words 'nature, characteristics, [and] qualities' in § 43(a)(1)(B) cannot be read to refer to authorship"); *digiGAN v. iValidate, Inc.*, 2004 U.S. Dist. LEXIS 1324 (S.D.N.Y. Feb. 3, 2004) (dismissing false advertising claim where plaintiffs alleged defendants advertised products embodying technology protected by plaintiff's patent); *I Candy by JW LLC v. Spin Master Ltd.,* 2018 U.S. Dist. LEXIS 251854, *65 (E.D.N.Y. June 19, 2018) ("Since defendant was the origin of the products it sold as its own, plaintiff cannot prevail on its Lanham Act claim."); *Invista S.a.r.l. v. E.I. Du Pont de Nemours & Co.*, 2008 U.S. Dist. LEXIS 94009, *9 (S.D.N.Y. Oct. 30, 2008) (Lanham Act "covers claims of misrepresentations about the origin of products sold in the marketplace, it does not protect 'the person or entity that originated the ideas or communications that 'goods' embody or contain.'") (quoting *Dastar*, 539 U.S. at 32); *Greene v. Warner Music Grp.*, 2024 U.S. Dist. LEXIS 107515, *37-38 (S.D.N.Y. June 18, 2024) (dismissing plaintiff's claims for false

designation of origin and passing off under the Lanham Act fail given the "well-established precedent" under *Dastar*) (collecting cases).

Even if, *arguendo*, Shield had used ZL's technology, such use does not constitute a false designation of origin under the Lanham Act, as the Supreme Court made clear in *Dastar*. The Lanham Act is not a vehicle for enforcing intellectual property rights in ideas or functional features; it is limited to preventing confusion as to the producer of tangible goods sold in the marketplace. ZL's attempt to recast a contract or trade-secret dispute as a Lanham Act claim is precisely the type of claim *Dastar* and its progeny prohibit.

**B.** **ZL's New York Claim for Unfair Competition Through Confusion or Mistake Fails to State a Legal Claim**

Like its federal Lanham Act claim, ZL's New York parallel unfair competition claim fails because Shield never sold its Shield products as anything but Shield products.[11] In the absence of a factual allegation that Shield "palmed off" its products as ZL's, the claim cannot survive this motion to dismiss. *See, e.g., Converged Compliance Sols., Inc. v. XOP Networks, Inc.*, 2024 U.S. Dist. LEXIS 173883, *41 (S.D.N.Y. Sep. 25, 2024) (dismissing unfair competition claim where "Plaintiff explicitly pleads that [defendant] XOP sold their *own* product") (emphasis in original); *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 226 (S.D.N.Y. 2023) (finding that the plaintiff had failed to plead "palming off" where "Plaintiff does not offer any credible allegations that Defendant copied its products or substituted its products for Plaintiff's products"); *Empower Fed. Credit Union v. Empower Annuity Ins. Co. of Am.*, 2024 U.S. Dist. LEXIS 137791, at *12 (N.D.N.Y. Aug. 2, 2024) (dismissing "palming off" claim where "Plaintiff's allegations

---

[11] With the federal claim dismissed, the Court should exercise its discretion and decline supplemental jurisdiction over any New York state claims that are not similarly dismissed against the Shield Defendants. *See* 28 U.S.C. § 1367(c)(2) and (c)(3).

regarding Defendant's alleged deception do not contain any facts indicating Defendant has attempted to sell its products as the products of Plaintiff").

Moreover, to prevail on an unfair competition claim based on confusion or mistake, New York common law requires "(1) actual confusion or likelihood of confusion; and (2) the defendant's bad faith." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 678 (S.D.N.Y. 2016). Neither element has been properly pled here.

As to confusion, courts look to the eight Polaroid factors of *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 496 (2d Cir. 1961) to determine likelihood of confusion under a New York unfair competition claim. *See RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 322 (E.D.N.Y. 2021) (to "assess the likelihood of confusion, the same factors relevant to a federal Lanham Act claim 'may be used ... for the purposes of a New York unfair competition claim.'") (quoting *Computer Assocs. Int'l Inc. v. AJV Computerized Data Mgmt., Inc.*, 889 F. Supp. 630, 638 (E.D.N.Y. 1995)). The eight *Polaroid* factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*RVC Floor Decor, Ltd.*, 527 F. Supp. 3d at 323; *Polaroid*, 287 F.2d at 496 (same). The first three factors – strength, similarity, and proximity – are the most important. *MidCap Bus. Credit, LLC v. MidCap Fin. Tr.*, 655 F. Supp. 3d 193, 205 (S.D.N.Y. 2023).

Plainly, the *Polaroid* factors require a comparison of marks, to determine if they are similar enough that consumers for the products would mistake one for the other. Here, ZL does not assert in the FAC that Shield ever used the "ZL UA" mark, or a similar or imitative mark, to identify its products. *See* FAC ¶¶ 40-44. Instead, ZL expressly alleges that "Shield variously called its big

data services "Nebula Big Data," "Nebula Archive" and "Nebula Legal Hold." FAC ¶ 46. ZL also refers to a "Nebula Intelligent Archive" powered by Shield (*id.* ¶ 52) and Shield's "Hybrid Cloud Solutions" (*id.* ¶ 57). These names are too dissimilar to "ZL UA" to create any confusion.

The FAC identifies only one such consumer – Client – and provides no facts showing Client was confused in any way. FAC ¶¶ 14-62 (Common Facts). This is not surprising. Client, and the other consumers in this market, are large sophisticated financial institutions that act carefully and deliberately. Thus, ZL expressly alleges that Client placed two formal requests for proposal into the marketplace, and that Shield won those RFPs. FAC ¶¶ 60-61. Under an RFP process, it is impossible for Client (or any other large financial institution) to become confused or mistake with whom it is dealing when purchasing and deploying Shield products. Courts in this judicial district readily recognize that where, as here, the consumer is sophisticated and the good or service is expensive – large financial institutions engaging in a formal RFP process – the likelihood of confusion is significantly diminished. *See, e.g.*, *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 246 (S.D.N.Y. 2004) ("the more sophisticated [the] … consumer of a product is, the less likely … similarities in … trademarks will result in confusion concerning the source or sponsorship of the product"; finding no likelihood of confusion); *Louis Vuitton Malletier v. Dooney & Bourke*, Inc., 561 F. Supp. 2d 368, 389 (S.D.N.Y. 2008) (holding the eighth *Polaroid* factor weighed against finding of confusion where both parties' clients were "sophisticated and discerning … and are not likely to be easily confused" and the expense of the good meant "the reasonably prudent buyer does not buy casually, but only after careful consideration"). Here, the FAC itself alleges that Client issued formal requests for proposals, rendering implausible any ZL allegations of actionable confusion.

ZL's *ipse dixit* assertion that "Defendants have acted unfairly and in bad faith" (FAC ¶ 83) is insufficient to prevent dismissal. *See, e.g., Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 602 (E.D.N.Y. 2017) (conclusory allegations insufficient to support inference of bad faith); *CDC Newburgh Inc.*, 692 F. Supp. 3d at 226 (stating that "even if the Court agreed with Plaintiff that Defendant committed misappropriation, Plaintiff's conclusory accusations that Defendants…'acted with actual malice or with reckless disregard for the truth of [the Reports]' and submitted the Reports …'with the intent to injure Plaintiff without regard for the accuracy of the statements' are, absent supporting factual allegations, conclusory, and thereby plainly insufficient to show that Defendant did so in 'bad faith,' as is necessary to state a plausible claim for misappropriation.") (internal citations omitted); *Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 266 (E.D.N.Y. 2016) (finding "plaintiff's conclusory allegation regarding bad faith insufficient to state an independent, sustainable claim of unfair competition").

ZL's bad faith allegation is grounded in its self-serving and unsupported speculation that "Shield actually hired Gardner to gain access to ZL's solutions and architecture." FAC ¶ 51. Nowhere in the FAC, however, does ZL allege facts showing that being "a point of contact for the Client account" (*id.* ¶ 36), or "Vice-President, Compliance, Information Governance and Archiving" (*id.* ¶ 37), would have given Gardner access to the code underlying ZL's technology. Nor does ZL adduce facts showing that Gardner had the skills or expertise to recreate that technology after he came to work for Shield Delaware.

That Gardner moved from KLD to Shield, or that ZL feels the development timeline was too truncated, does not render the allegation of bad faith plausible under *Twombly, supra*. In *SS&C Techs. Holdings, Inc. v. Arcesium LLC*, for example, the Court held that, where plaintiff did not allege defendant "was incapable of independently developing [its own technology] in the

timeframe that it took," plaintiff's allegations did not "allow the court to draw a reasonable inference that the development timeline of [the technology at issue] was truncated as a result of any misappropriation." 2024 U.S. Dist. LEXIS 230686, at \*34 (S.D.N.Y. Dec. 20, 2024). Likewise, in *Fleming Sales Co. v. Bailey*, 611 F. Supp. 507, 514 (N.D. Ill. 1985), the Court observed that "general skills and knowledge acquired in the course of employment are things an employee is free to take and to use in later pursuits." *See also McCarter & Eng., LLP v. Jarrow Formulas, Inc.*, 715 F. Supp. 3d 281, 363 (D. Conn. 2024) (noting the "majority rule" that "upon the termination of agency and in the absence of a restrictive agreement, the agent can properly compete with his principal in matters for which he had been employed"). Thus, the mere fact that an employee with industry experience changes employers, even among competitors, cannot establish bad faith, absent the type of concrete *factual* allegations of improper conduct, unauthorized disclosure, or use of confidential information missing here.

## II. THE COURT SHOULD DISMISS COUNT TWO OF THE FAC (UNFAIR COMPETITION BY MISAPPROPRIATION) WITH PREJUDICE

Under New York law, a plaintiff asserting a misappropriation theory of an unfair competition claim must show two things: (1) "the defendant has misappropriated the labors and expenditures of another," and (2) it did so in "bad faith." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980); *CDC Newburgh Inc.*, 692 F. Supp. 3d at 226. ZL has not successfully pled either element.

First, while Shield categorically denies it incorporated ZL technology into its own products, even if it had, there was no misappropriation under the terms of the SDLSA and PLA attached to the FAC as Exs. 1 and 2, respectively. Under those contracts, both KLD and Client were given broad, perpetual and irrevocable licenses to use, and continue using, ZL's products. *See* SDLSA (FAC, Ex. 1) and PLA (*id.*, Ex. 2); Statement of Allegations, Missing Allegations,

and Facts, *supra*. ZL neither sought nor obtained any protection from the licensed software's use by third parties like Shield. Indeed, ZL's software was contractually allowed to be shown to, and used by third parties. *Id*. Even after the PLA terminated almost a decade ago, back in 2018, at no point did ZL attempt to limit access to the software it now claims as "Confidential." Certainly, ZL did not do anything as to Shield at any point from 2018 through 2025, including when Aaron Gardner became a Shield Delaware employee in 2022, or when "[i]n June 2022, Shield Israel announced its partnership with KLDiscovery for the release of the Nebula Intelligent Archive." *See* FAC ¶¶ 45-52. ZL did nothing because it had no valid "misappropriation" claim then, just as it has no valid "misappropriation" claim now.

Second, as discussed *supra* at Argument, Point I(B), ZL's entirely conclusory allegations of misappropriation and bad faith lack the facts necessary to push its claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## CONCLUSION

This is ZL's second attempt to plead viable claims against Shield Delaware, and the defects in its claims are fundamental and incurable. Allowing ZL further leave to amend would only waste judicial and party resources. Accordingly, the Court should (i) dismiss ZL's First Amended Complaint against Shield Delaware with prejudice, and (ii) grant Shield Delaware such other and further relief as the Court deems just and proper.

Dated: August 7, 2025
New York, New York

Respectfully submitted,

/s/ Yoav M. Griver
Yoav M. Griver
Scott B. Brenner
ZEICHNER ELLMAN & KRAUSE LLP
730 Third Avenue
New York, New York 10017
*Attorneys for Defendants Shield Financial Compliance, Ltd. and Shield Financial Compliance, Inc.*

**CERTIFICATE OF COMPLIANCE WITH**
**TYPEFACE AND WORD COUNT LIMITATIONS**

1. This document complies with the type-volume limit of EDNY-SDNY Joint Local Rule 7.1 because, excluding the parts of the document exempted by that rule, it contains **6,706** words.

2. This document complies with the typeface requirements of EDNY-SDNY Joint Local Rule 7.1 because it has been prepared with one-inch margins in a proportionally spaced typeface using Microsoft Word in 12-point font in Times New Roman type style.

Dated: August 7, 2025
New York, NY

*/s/ Yoav M. Griver*
Yoav M. Griver